**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 12-CR-0037 |
| AMINE EL KHALIFI, | ) | |
| | ) | |
| Defendant. | ) | |

**United States' Response in Opposition to
Defendant's Motion for Compassionate Release**

On February 17, 2012, the Defendant, Amine El Khalifi, tried to blow up the United States Capitol Building. ECF 25 at 1 (Statement of Facts). He failed, and was arrested that same day. *Id.* at 7. After accepting a guilty plea, this Court sentenced the Defendant to 30 years in prison. ECF 44 at 2 (Judgment). The Defendant himself "admitted that his punishment should be no less than twenty-five (25) years in prison." ECF 32 at 1 (Defendant's Position With Regard To Sentencing Factors). And yet, after less than only nine years, the Defendant now seeks early termination of his prison term under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i). In particular, the Defendant contends that his medical condition and the presence of COVID-19 at FMC Butner justifies his compassionate release more than 21 years ahead of schedule. And because the Defendant is a foreign national who came to the United States on a tourist visa in 1999 and has since overstayed, the Defendant is not eligible for home detention but, upon completion of his sentence, is subject to removal to his home country of Morocco.

The Court should deny the Defendant's motion. The early release proposed by the Defendant will subject him to detention in an Immigration and Customs Enforcement ("ICE") facility pending removal to Morocco. Expeditious removal is uncertain at this time in part due to widespread COVID-19-related travel restrictions in place around the world. The Defendant

himself concedes that this process "could take several months," *see* ECF 47 at 27 n.5, and there is no reason to think ICE custody would provide the Defendant with better protection against COVID-19 than his current accommodations, much less the same level of medical care the Defendant now enjoys in the Federal Medical Center at Butner.  And even if the Defendant did return to Morocco, he has offered no evidence to demonstrate that his risk of contracting COVID-19 would be lower in his home country than in his Bureau of Prisons ("BOP") facility.

The health and safety of the Defendant aside, the Court should also deny his motion in light of the 18 U.S.C. § 3553(a) factors and a host of other reasons.  The Defendant's planned attack could not have been more violent, more destructive, or more senseless.  There is no good reason to think the dangers he posed then would be any less harmful now.  Releasing a defendant after less than one third of his sentence creates extreme disparities among those who have committed such serious crimes and ruins the deterrence that sentencing judges seek to promote among those who might otherwise commit such crimes as well.  For all of these reasons, and for the reasons below, the Court should deny the Defendant's motion.

## Background

On February 17, 2012, in Northern Virginia, the Defendant climbed into a van driven by a man the Defendant believed to be an al-Qaeda operative.  ECF 25 at 3, 7 (Statement of Facts). They drove to a parking garage in Washington D.C., near the Defendant's target for his mission "to conduct a suicide/martyrdom operation[:]" the United States Capitol Building.  ECF 25 at 4, 7.

The Defendant had been planning this terrorist attack for months.  *Id.* at 1.  On December 1, 2011, the Defendant traveled with a self-described al-Qaeda operative from Alexandria, Virginia to Baltimore, Maryland.  ECF 25 at 1-3.  There, the "operative" introduced the Defendant to a man known as "Yusuf," who represented himself as part of an armed extremist group but who was

2

actually an undercover law enforcement officer.  *Id.*  The Defendant "asked to be associated with that [armed extremist] group," too.  *Id.* at 2.

Even at that first meeting, the Defendant already had a violent plan in mind:  the Defendant "told Yusuf that [he] had a plan to explode a bomb at an office building in the City of Alexandria containing offices occupied by the U.S. military."  *Id.*  He further explained, while actually handling Yusuf's AK-47, that he also "wanted to conduct an operation in which he would use a gun to kill people face to face."  *Id.*

Over the following weeks and months, the Defendant continued to revise his plan.  First the Defendant "wanted to attack a synagogue."  *Id.* at 2.  Then he considered "research[ing] where Army generals live," presumably so he could attack them in their homes.  *Id.*  Then, after he found a government building where "high-ranking military officials" worked, the Defendant decided he wanted to bomb the restaurant next door, "because it was frequented by military officials."  *Id.* The Defendant conducted surveillance on the restaurant and questioned a waiter to "learn[] that the restaurant was busiest at lunchtime," so he could time the bombing to kill the most people.  *Id.* at 3.  After discussing with the purported al-Qaeda operative the possibility that the restaurant bombing would be followed by a military installation bombing, the Defendant agreed to purchase cell phones and IED materials for that second attack.  *Id.*

The Defendant was as good as his word.  Over the following week, the Defendant purchased or otherwise acquired and delivered to Yusuf the promised cell phones, glue, nails, and other IED components for the second bombing attack.  *Id.* at 4.

That same week, on January 15, 2012, the Defendant and the self-described al-Qaeda operative drove out to a quarry in West Virginia to meet Yusuf and, together, test the bombing mechanism the Defendant intended to use in his attack.  *Id.* at 4.  During the drive, the Defendant

informed the "operative" that he had decided on a new target:  Instead of bombing a restaurant next to a government building, the Defendant now planned to "blow himself up in the United States Capitol Building in Washington, D.C."  *Id.*  The Defendant cautioned him "not to question his desire to do the attack," assuring him that "he would be happy killing 30 people."  *Id.*

Once they arrived, they assembled a bomb and placed it in the quarry, both so the Defendant could practice detonating the bomb via cell phone, and "to see what the explosion would look like from a device similar to [the one] he planned to detonate at the United States Capitol Building."  *Id.*  The Defendant dialed the number, and the bomb exploded.  *Id.*  The Defendant's response was to "express[] a desire for a larger explosion in his attack" because "he wanted a bigger bomb to do more damage"—one that "could destroy the entire building."  *Id.* at 4-5.  He later "asked for even more explosives to tape to his body for his martyrdom operation."  *Id.* at 5.

On January 28 and February 6 the Defendant conducted surveillance on the Capitol Building, choosing where they should drop him off, how he would approach the building, what entrance he would use, and—notably—how he would respond if security officers tried to intervene.  *Id.*  On that score, the Defendant made two requests:  the first was that, if the Defendant were thwarted, the operative would detonate the bomb remotely; and the second was for an automatic weapon "that he could use during the attack to shoot any officers who might attempt to stop him."  *Id.*

Over the next two weeks the Defendant took possession of a MAC-10 automatic weapon, practiced pulling the trigger, tried on the jacket that he thought contained the suicide bomb, and practiced drawing the weapon while wearing the jacket.  *Id.* at 6.  He also practiced the denotation mechanism.  *Id.*  And on multiple occasions he described how he "would shoot the police officer stationed at the door" and, regardless, that he "intended to use the MAC-10 automatic weapon to

shoot people before detonating the bomb." *Id.* at 7.  What the Defendant did not know was that both the suicide vest and the automatic weapon had been rendered inoperable.  *Id.*

Meanwhile, the self-described al-Qaeda operative told the Defendant that Al-Zawahiri planned to release a statement after the Defendant carried out his attack on the Capitol.  The Defendant asked that Al-Zawahiri refer to him in the statement as "al maghrabi."  *Id.* at 6.

Finally, on February 17, 2012, the Defendant's selected date had arrived.  The van carrying the Defendant from Alexandria arrived in the D.C. parking garage the Defendant had selected, just a short distance from the Capitol.  *Id.* at 6.  Wearing the suicide vest and carrying the MAC-10 automatic weapon, the Defendant stepped out of the van and started toward his target.  As the Defendant walked alone toward the United States Capitol Building, he fully intended to gun down unsuspecting civilians before detonating a bomb large enough to destroy the entire building, and everyone within.  *Id.* at 4-7.

Before he reached the Capitol Building, however, the Defendant was arrested.  *Id.*  Shortly thereafter, he plead guilty to a single count of attempting to use a weapon of mass destruction in violation of 18 U.S.C. § 2332a(a).  Even after a three-point reduction for acceptance of responsibility, the guidelines range counseled life in prison.  ECF 40 at 26.  The United States sought a sentence of 30 years.  ECF 31 at 3.  And the Defendant, for his part, "admitted that his punishment should be *no less than* twenty-five."  ECF 32 at 1 (emphasis added).

On September 14, 2012, the Court sentenced the Defendant to 30 years in prison, followed by 10 years of supervised release with the special condition that, upon his release, the Defendant "shall surrender to immigration officials…to be deported to Morocco."  ECF 41 at 1.  On October 30, 2020, eight years after he was sentenced to 30 years, the Defendant filed a motion seeking to have his sentence terminated.

**Argument**

**I.     The Defendant's request for compassionate release to a foreign country should be denied due to a number of practical and legal considerations.**

The BOP is actively working on the critical problem of containing the spread of the coronavirus within prisons and has implemented a number of health and safety procedures governing all BOP facilities, including FMC Butner.  BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.

Importantly, nothing in the CARES Act provides for the relief the Defendant now seeks— early termination of his custodial sentence and release to an ICE facility pending his removal to a foreign country.  Instead, where the legislation concerns federal inmates, Congress focused on temporarily enlarging BOP's discretion to place inmates in home confinement.  *See* CARES Act, Section 12003(b)(2) (temporarily expanding BOP's existing authority under § 3624(c)(2) to designate prisoners to home confinement).  Since March 26, 2020, BOP has placed more than 16,840 inmates on home confinement (*see* https://www.bop.gov/coronavirus/index.jsp), focusing on, among other factors, the vulnerability of particular inmates, the prisons most at risk, and the dangers posed by inmates if released.  Inmates do not have to apply to be considered for home confinement.  In addition to its efforts to increase the use of home confinement, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

In weighing the appropriateness of home confinement, BOP considers, among other factors, whether a home is available where the inmate could be confined, whether the inmate could receive appropriate food and medical care there, the comparative risk to the inmate in home

confinement in the identified location versus remaining in prison, the inmate's risk to the public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking.  BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others—including to the very individuals who would be needed to make home confinement successful.  To help accomplish that goal, BOP is requiring a 14-day quarantine period before any inmate is released to home confinement.

Here, the Defendant's request for the Court to terminate his custodial sentence and order him released to ICE pending removal to his home country, *see* ECF 47 at 27, raises multiple practical concerns, including whether ICE has the resources to ensure the health and safety of its staff and additional foreign defendants transferred to its custody before their scheduled release date, and whether the Defendant's home country is able to expeditiously accept repatriated citizens who have recently been incarcerated in the United States.[1]  Indeed, without the appropriate resources and safety measures in place, release to ICE custody could increase the very health and safety risks that courts, the government, and defendants are seeking to mitigate.

In contrast to the vast logistical and practical uncertainties surrounding the Defendant's proposal to be released into ICE custody and then deported to a foreign country, the BOP has significantly altered operations within federal prisons to implement guidance issued by the Centers for Disease Control and Prevention ("CDC") to manage the transmission of COVID-19. The current modified operations plan requires that all inmates in BOP institutions be secured in

---

[1] ICE detention centers are operating at decreased capacity due to COVID-19; ICE reduced detainee populations to 70% or less to increase social distancing.  ICE Guidance on COVID-19, U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus (last visited Nov. 11, 2020).

their assigned cells or quarters for a period of at least 14 days to stop any spread of the disease. Only limited group gatherings are permitted, with social distancing required to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has limited the movement of inmates and detainees among its facilities. Though there are exceptions for medical treatment and similar exigencies, this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved. Every newly admitted inmate is screened for COVID-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, to limit the number of people entering the facility and interacting with inmates. To ensure that family relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to

8

500 minutes per month.  Tours of facilities are also suspended.  Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.  No-contact revised visitation has resumed in BOP facilities as of October 3, 2020, and "every CDC recommended precaution will be incorporated into [BOP's] revised visiting procedures." *See* https://www.bop.gov/resources/news/20200902_visitation.jsp.  More information about each institution's revised visiting procedures and schedule is forthcoming and will be posted on www.bop.gov.  Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Rather than relying on BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—the Defendant's request imagines a system where hundreds of federal district judges around the country try to use the tools of litigation to assess the capacity of immigration authorities to take custody of foreign defendants on an accelerated schedule.  Unfortunately, making decisions without the necessary information—including whether resources are available to safeguard detainee's and staff's health and safety in ICE facilities and whether detainees can be expeditiously removed in a time when widespread travel restrictions are in place—could nullify the intended goal of any court order.

Under the present circumstances and, in particular, the circumstances surrounding a foreign national's request to be released into ICE custody for removal to his home country, this Court should consider a wide range of important factors that bear on the inmate's health as well as the

9

health and security of others:

- *Addressing the impact of releasing a foreign defendant to the custody of ICE.* A release order in a case involving a foreign national should include measures to ensure that an inmate who is presently incarcerated is not infected by the time the Court orders any release of an inmate into the custody of ICE. A release order should not only assess any additional risks that could be brought on by a defendant and any individuals presently working at, or housed in an ICE facility, including ICE officials, who may be required to supervise the defendant if he is transferred there. Courts should also consider how the accelerated release of a BOP inmate into ICE custody could impact the availability of health resources at ICE facilities, such as testing and protective equipment;

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside the defendant's prison.* Before a defendant receives the benefit of being released from prison, a court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in a BOP facility, *see* https://www.bop.gov/coronavirus/;

- *Avoiding recidivism.* The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points.[2] This risk is heightened when a serious criminal offender seeks release to a foreign country outside the reach of U.S. law enforcement and outside the reach of U.S. Probation Officers who can help offenders build a law-abiding life upon release; and

- *Assessing how much release would affect the particular inmate's health.* To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an inmate's health, odds that may be difficult for a Court to determine where release plans involve relocating an inmate

---

[2]    *See*        https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12.

10

to an ICE facility, pending removal to a foreign country with limited medical care that the CDC has flagged as high risk for COVID-19.[3]

This list is not exhaustive and, indeed, could include many additional considerations. These factors, however, underscore the fact that the Defendant does not grapple adequately with the numerous practical impediments to ensuring his health and safety, the health and safety of others, and the feasibility of his removal request.

## II.  The Defendant has not established a sufficient basis for compassionate release.

The Defendant bears the burden to demonstrate that he is entitled to compassionate release under § 3582(c)(1)(A)(i). *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019); *see also generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise … the burden of persuasion lies … upon the party seeking relief."). Compassionate release is not appropriate in this case because the Defendant has not established "extraordinary and compelling reasons" for such relief under § 3582(C)(1)(A)(i).

Courts have generally agreed that the existence of the pandemic, standing alone, is not a sufficient basis for granting compassionate release. As the U.S. Court of Appeals for the Third Circuit put it, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's

---

[3] "CDC recommends travelers avoid all nonessential international travel to Morocco. Travelers at increased risk for severe illness from COVID-19 should consider postponing all travel, including essential travel, to Morocco. COVID-19 risk in Morocco is high. If you get sick in Morocco and need medical care, resources may be limited." COVID-19 in Morocco, Travelers' Health, Centers for Disease Control and Prevention, https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-morocco (last reviewed Nov. 11, 2020) (hereinafter "CDC Morocco Travel Warning").

11

spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).  Instead, courts in this district have found "extraordinary and compelling reasons for compassionate release [on the basis of COVID-19] when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, — F. Supp. 3d —, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, — F. Supp. 3d —, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)).[4]

Although the Defendant has demonstrated that he has a particularized susceptibility to COVID-19 due to his medical condition, he has not shown that he faces a particularized risk of contracting COVID-19 in his particular unit within the BOP facility, much less that early release to an ICE detention facility for expedited removal to Morocco would reduce his risk of contracting COVID-19.  As explained below, his proposal is to be released into the custody of ICE, which will then seek his removal—a process that, by the Defendant's own admission, "could take several months." ECF 47 at 27 n.7.  And even then, the Defendant has made no showing that his proposed course provides a practical or viable alternative to the resources available to him at the BOP medical facility where he is currently housed.

A.    **The Defendant has not shown that he in particular is at a heightened risk of a contracting COVID-19.**

The Defendant's claim that he in particular has a heightened risk of contracting COVID-19 is equally unpersuasive.  Although the number of positive cases in FMC Butner has risen in the weeks since the Defendant's motion,[5] those cases do not create a COVID-19 risk that is

---

[4] *See also United States v. Little*, No. 1:10-CR-135 (CMH), 2020 WL 3442173, at *2 (E.D. Va. June 23, 2020) (adopting the criteria from *Feiling*); *United States v. White*, No. 3:18-CR-61 (HEH), 2020 WL 3442171, at *5 (E.D. Va. June 23, 2020) ("Defendant's request for release on home confinement is based upon nothing more than 'the mere possibility that COVID-19 will spread to his facility'-a fear that is insufficient to justify release."(citing *Feiling*)).

[5] BOP's website indicates that, currently, 123 inmates are positive for COVID-19.

particularized to the Defendant.  Indeed, an attorney in the Butner Legal Center represented to the undersigned counsel that the increase in positive cases at FMC Butner were concentrated in the lower-security section of the complex where inmates sleep in an open-bay dorm with open-air cubicles.  The Defendant, by contrast, is located in the Oncology Unit in an entirely different section of the complex.  There, the inmates have far more limited movement and are housed in more isolating cells.  To illustrate the point, out of the 148[6] past and current COVID-19 cases among FMC Butner inmates since March, only three of those cases arose on the floor where the Defendant resides.  All three of those inmates have since recovered.  And those numbers are relative     to     FMC     Butner's     total     inmate     population     of     814.          *See* https://www.bop.gov/locations/institutions/buh/, last visited on November 11, 2020.  Currently there are no confirmed COVID-19 cases on the Defendant's entire floor.  And throughout the pandemic, no inmate in FMC Butner has died of COVID-19.

Moreover, all inmates who test positive are being appropriately treated or isolated according to CDC guidelines adopted by the BOP.  The facility continues to adhere to the BOP modified operations plan described above and has, among other steps, restricted prisoner movements within the facility, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, and provided masks and hand cleaners.

Although the Defendant claims that his risk of contracting COVID-19 is greater in a custodial setting, ECF 47 at 11, he does not argue, let alone establish, that such a risk is greater at FMC Butner than in an ICE detention facility or in Morocco.  Nor can he.  Given the number of unknowns—*i.e*., the exact date that the Defendant would be removed to Morocco, how long the

---

[6] This number was obtained by visiting https://www.bop.gov/coronavirus/, clicking on "Full breakdown and additional details," and then, on the row labeled "Butner FMC," combining the columns labeled "Inmates Positive" and "Inmates Recovered."  Lasted visited November 13, 2020.

Defendant would remain in an ICE facility before being removed, where the Defendant would be housed while in ICE custody, and the risk of transmission at the ICE facility—the Defendant simply cannot meet his burden of demonstrating that his risk of contracting COVID-19 is greater at FMC Butner than in ICE custody. Nor does he meet that same burden as to his risk of infection once removed to Morocco.

For all of these reasons, the Defendant has not shown, in any particularized fashion, that he is entitled to compassionate release based on the risk of contracting COVID-19 at his place of confinement. *Cf. United States v. Campos-Ramenthol*, 805 F. App'x 328, 330 (5th Cir. 2020) (defendant not entitled to pretrial release due to COVID-19 where "[t]here were no reported cases of COVID-19 at the jail" where he was housed and "the jail has procedures in place in case of an outbreak, including the isolation of high-risk inmates").

### B. The Defendant has failed to show how his proposed release plan presents a viable alternative or reduces his risk of contracting COVID-19.

Courts in this district have evaluated whether the release plan proposed by defendants would introduce new risks to themselves or others. *See, e.g., Feiling*, 2020 WL 1821457, at *8 ("Defendant fails to establish how his release on home confinement presents a viable alternative sentence. Indeed, Defendant's release on home confinement presents its own risks to Defendant's health, the health of his family and public safety."). As one magistrate judge has concluded, when there are no cases of COVID-19 at a particular facility, "it would be speculative to say whether [a defendant's] release plan … truly mitigates [his] health risks rather than potentially exacerbating them." *United States v. Duncan*, — F. Supp. 3d —No. 18-CR-40030-1 (HLT), 2020 WL 1700355, at *1 (D. Kan. Apr. 8, 2020).

The Defendant's proposal here is equally speculative. Based on ICE's current reduced operations in light of COVID-19, it is unclear that ICE has the resources to take custody of BOP

inmates earlier than their expected release date. The Defendant is therefore unable to establish that a transfer from BOP—which has adopted a thorough set of healthcare and screening procedures to manage and mitigate the transmission of COVID-19—to ICE is a viable and safer alternative. It is also unclear whether the Defendant's home country is in a position to repatriate him expeditiously while the risk of COVID-19 in Morocco remains high and there is a lack of access to medical care there. *See* CDC Morocco Travel Warning, n.3 above. As explained in *United States v. Brady*, releasing the defendant "from prison may be to simply take him out of the proverbial frying pan and place him into the fire, as the general public continues to suffer from COVID-19 as well." No. 18-CR-316 (PAC), 2020 WL 2512100, at *4 (S.D.N.Y. May 15, 2020)

But for the Defendant, here, the tradeoff is far worse than the frying pan for the fire. Right now, the Defendant is being housed in Federal *Medical* Center Butner, where in the last year alone the Defendant has received extensive (and otherwise expensive) medical care. According to the Defendant's own brief, for example, he has received four rounds of chemotherapy, multiple CT and PET scans and biopsies, and two months of radiation therapy. ECF 47 at 11-12. And as an attorney in the Butner Legal Center represented to the undersigned counsel, the Defendant lives in the Oncology Unit. There is no reason to conclude—and much reason to doubt—that, if released, the Defendant would have access to comparable medical care during this pandemic. And the Defendant has provided no evidence demonstrating otherwise. *See United States v. Chappell*, No. 16-CR-512 (LTS), 2020 WL 3415229, at *3 (S.D.N.Y. June 22, 2020) ("The record also demonstrates that Mr. Chappell is regularly receiving appropriate medical care at his facility, and Mr. Chappell has provided no indication that he will have ready access to the requisite medical care for his serious health concerns if his request for immediate home confinement or transfer to a halfway house is granted.").

15

### C.    In the exercise of its discretion, the Court should deny compassionate release in light of the statutory sentencing factors

Compassionate release is appropriate only where the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). That statute instructs the Court to consider several factors, including whether the underlying offenses constitute crimes of violence or involved firearms. At the same time, § 3582(c)(1)(A) expressly directs the Court to consider the statutory sentencing factors under 18 U.S.C. § 3553(a) in adjudicating a compassionate-release motion. Here, these factors counsel strongly against granting a reduction in the defendant's sentence.

The nature and circumstances of the offense, as planned and attempted by the Defendant, could not have been more violent or destructive—trying to blow up the United States Capitol Building after first shooting police officers and tourists with a MAC-10 automatic rifle. In addition to the personal devastation this attack would have inflicted in each of the lives ripped away and each of the loved ones left grieving, this terrorist attack would have shaken the Country to its core. This factor alone justifies denying the Defendant's motion.

But other factors point the same direction. Releasing the Defendant more than 21 years early would critically undermine the goal of deterring this sort of catastrophic crime while creating wide disparities among those who have been sentenced for committing them. That reality is evident from the fact that, at sentencing, even the Defendant "admitted that his sentence should be no less than twenty-five (25) years in prison." There is no basis to effectively reduce the Defendant's sentence to less than only nine years.

None of the Defendant's contrary arguments are persuasive. First, the Defendant's argument that he should get credit for expressing remorse and accepting responsibility ignores the fact that the Defendant already benefited from the related 3-point reduction and a below-guidelines

16

sentence of 30 years instead of life.  *Compare* ECF 41 at 1 *with* ECF 40 at 26.

Second, the Defendant's expressions of remorse aside, this was not an isolated act of youthful poor judgment.  In truth, his crimes were neither momentary nor theoretical.  Rather, the Defendant took numerous distinct and concrete actions over the course of months, carefully constructing, investigating, revising, finalizing, and then actually executing plans to mass-murder civilians.  That his plan was thwarted does not render the Defendant safe to the community, regardless of whether the Defendant remained in the United States or was removed to Morocco, where supervised release would have no ability to prevent renewed efforts for the Defendant to contact armed extremist groups like he sought to do before.  The Defendant's willingness (even eagerness) to die himself so long as he also got the chance to kill others, makes him especially impervious to deterrence and especially dangerous to the public.

Third, these murderous plans were not planted by undercover agents, as the Defendant now seems to suggest.  To the contrary, as the United States pointed out just before sentencing,[7] the undercover agents contacted the Defendant in the first place specifically because they had information that he had already "tried to contact foreign terrorist groups long before he tried to bomb the United States Capitol Building with the assistance of what he thought were representatives of al-Qaeda."  ECF 35 at 2.  As that filing details, law enforcement received information that the Defendant had also made multiple posts to social media that reflected violent intentions, including a video of al-Qaeda leader Abu Al-Zarqawi beheading an American and a "message purportedly from Usama Bin Laden calling for the destruction of the United States."  *Id.* at 2-3.

---

[7] As noted in the United States' sentencing memorandum supplement, although the Defendant did not recall some of these social media posts and objected to their inclusion in the PSR, the witness who described them to law enforcement was prepared to testify at trial.  *See* ECF 35.

Fourth, the Defendant's unremarkable disciplinary record while in prison does nothing to suggest he is no longer capable of such violence in the future, just as his unremarkable criminal record before 2011 did nothing to preclude his efforts to blow up the Capitol Building in 2012.

Fifth, the Defendant's efforts to portray himself as a well-meaning young man who got swept away in religious devotion both demeans actual religious devotion and ignoring reality: The violence and cruelty of the Defendant's planned attack was not the unanticipated byproduct of a high-minded effort. It was precisely the point. The Defendant didn't want merely to kill faceless people who happened to be standing around when the bomb exploded. No—he wanted to personally witness the carnage, suffering, and death. As he repeatedly stated, he wanted to kill people face to face by shooting them himself before he detonated the bomb and brought down the building on all of them. *See* ECF 25 at 5-7. For these reasons and more, the Defendant should serve the remaining time on his sentence.

*      *      *

If this Court were to disagree with the United States' position, however, any order granting the defendant compassionate release should require him to undergo a 14-day quarantine that BOP controls before any release into the custody of any other government agency, including ICE.

**Conclusion**

For the foregoing reasons, the Court should deny the defendant's motion for compassionate release.

18

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney


/s/ Matthew P. Downer

Matthew P. Downer
Special Assistant United States Attorney
Marc J. Birnbaum
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Office:   (703) 299-3773
Fax:      (703) 299-3980
Email:    Matthew.Downer2@usdoj.gov

## Certificate of Service

I certify that on November 13, 2020, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.

By:   /s/ Matthew P. Downer

Matthew P. Downer
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Office:   (703) 299-3773
Fax:      (703) 299-3980
Email:   Matthew.Downer2@usdoj.gov

20