UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

_____

**UNITED STATES OF AMERICA**

    **v.**

                              **No. 1:12-CR-037**

**AMINE KHALIFI,**

                              **REPLY MEMORANDUM**

    Defendant.

_____

### DEFENDANT'S REPLY MEMORANDUM

**Underlying Case**

The government spends several pages describing the offense, and notes that the defense was asking for a 25 year sentence. That was because this was a Rule 11(c) plea, and that sentence range was negotiated with the prosecution - it does not mean that is what the defense thought was the optimum sentence. Moreover, that recommendation was made before a pandemic was ravaging federal prisons, and before Mr. Khalifi was diagnosed with Lymphoma, making him very vulnerable to death from the pandemic.

While the offense was very serious, the government's description minimizes the degree to which the undercover agents influenced him along the way. Prior to their involvement, he never had any thoughts of committing an attack in the United States, and was only expressing some interest in going overseas. The agents inflamed him by speaking of the suffering of Muslims and the evils of the United

1

States, and gave him "religious reinforcement" emphasizing that he was correct in his very misguided ideas of what his religion required from him. During the 2 ½ month period of the sting operation, they gave him all of the (inoperable) weapons, training, and explained to him that some of his harebrained schemes were not feasible.

Significantly, the agents provided Mr. Khalifi with $5700 at a time when he was financially desperate, and they promised his parents would be taken care of in the future, something which was (and is) very important to him.

Amine Khalifi is very aware of how horribly wrongful his intentions were; is (and was) glad that the plot was not real; is extremely remorseful; and has done very well in prison. There is another terrorism case where the court recently granted compassionate release in similar circumstances. In *United States v. Hasanoff*, 2020 U.S. Dist. LEXIS 199816 (SDNY October 27, 2020) the court granted compassionate release (based on the need to care for his mother, and his rehabilitation) where the defendant had been convicted of providing material support to Al Qaeda, and had served about half of his sentence. The *Hasanoff* court stated:

> "Hasanoff's crimes were extremely serious. … However, Hasanoff points out that when he committed the offenses, he was in his early thirties, did not 'have a good sense of his place in society,' and was susceptible to seeking guidance from 'all the wrong places.' These circumstances have changed. In his motion and supporting papers, Hasanoff sincerely and repeatedly expresses remorse for his actions. … The BOP considers

Hasanoff to be at 'minimum risk' of recidivism. … Hasanoff is not a danger to any person or the community." *Hasanoff*, at 17-18.

Amine Khalifi was in his late 20's when the offense herein occurred, even younger than the defendant in *Hasanoff*, and he also lacked "a good sense of his place in society," was vulnerable to guidance from "all the wrong places," and has expressed sincere remorse. Upon information and belief[1], based on his prison record, the BOP also considers him to pose a "minimum risk" of recidivism.

In addition, as discussed in the end of this Reply, it turns out that recidivism rates in terrorism cases are exceedingly low. (Undersigned counsel compiled a list of *44 defendants who served at least 10 year sentences in terrorism cases,* and *who have since been released, and it appears that none of them has been implicated in any terrorist activity since being released.* See Exhibit "A")

**ICE Detention and Deportation are not Reasons to Deny the Motion**

While the government concedes that Mr. Khalifi's cancer makes him especially vulnerable to serious complications or death from COVID-19, a great deal of the response argues that the motion should be denied because 1) if granted he would be in ICE detention for some time, and then deported to Morocco, where

---

[1] It appears that the Pattern risk assessment instrument used by BOP was not administered to Mr. Khalifi, apparently because they have not yet begun to utilize this for inmates in medical prisons who are undergoing extensive treatment and not able to complete programs like other inmates in the general population. However, based on knowledge of Pattern scores in many similar cases, it is submitted that Mr. Khalifi's Pattern score would show minimal risk.

there are many COVID-19 cases; and 2) he is safe from COVID-19 in the Oncology Unit at FMC Butner.

First, the fact that Mr. Khalifi would have to spend some time in ICE detention is not a proper reason to deny this motion. The standard is whether he has shown an extraordinary and compelling reason to reduce his sentence, and whether the 3553(a) factors support the reduction.

There are many cases where courts have recently granted compassionate release, despite the fact that the defendant was to then be placed in ICE detention. See, i.e. *United States v. Bornales*, 2020 U.S. Dist. LEXIS 208547 (EDVA November 6, 2020); *United States v. Frometa*, 2020 U.S. Dist. LEXIS 193073 (SDNY October 19, 2020); *United States v. Camacho-Duque*, 2020 U.S. Dist. LEXIS 188532 (SDFL October 5, 2020); *United States v. Yrorita*, 2020 U.S. Dist. LEXIS 151935 (EDMI 2020); *United States v. Morrison*, 2020 U.S. Dist. LEXIS 110734 (DMD 2020); *United States v. Ullings*, 2020 U.S. Dist. LEXIS 83104 (NDGA 2020); *United States v. Guzman Soto*, 2020 U.S. Dist. LEXIS 77074 (DMA 2020.)

In *Bornales*, supra, which was granted in this district very recently, the government did not argue that the impending ICE detention should preclude that court from granting the motion, and in *Morrison*, supra, the government did not oppose release notwithstanding the ICE detention.

4

In none of those cases did the court find that the ICE detention was a reason to deny the motion. In *Yrorita*, supra, the court stated:

"Here, the Government argues that Defendant should not be granted compassionate release because he is the subject of an ICE detainer, 'and thus he would be committed into ICE custody upon his release from Monshannon.' … It is safer for Defendant to finish the remainder of his sentence at Moshannon, the Government contends, because a facility transfer heightens Defendant's risk of COVID-19 exposure and 'there are no guarantees that conditions in any given ICE facility will be superior to those at Moshannon.' …
*** 
While the Court notes the Government's concern with Defendant's transfer and heightened susceptibility to COVID-19, *mere speculation about the conditions at an ICE facility is an insufficient basis to deny compassionate release. …" Yrorita*, supra, at 11-12, emphasis supplied.

Moreover, in *Bornales*, supra, the court pointed out that ICE evaluates new detainees for risk factors for COVID-19, and may release them on bond sooner [or take other measures to protect them] if they cannot be removed right away. It is noted that in the case of *United States v. Sami Hassoun*, , Mr. Hassoun is awaiting deportation to Lebanon, which is due to occur soon (undersigned counsel was told it was likely to occur before the end of October, but that did not occur due to issues landing a charter flight in Beirut.)

When ICE learned about Mr. Hassoun's vulnerability to COVID-19 (based on a rare auto-immune disease) he was transferred to the ICE detention center in Batavia, New York, where he is able to obtain the uncommon and expensive medicine he needs for his condition. In addition, he is kept apart from the other

detainees there in order to protect him. Finally, the Batavia facility (which previously had a COVID-19 outbreak) is subject to a consent decree whereby many protective measures are in place. It seems likely that if Mr. Khalifi is granted release from BOP custody, he would also be placed in the Batavia center, given its medical facilities and that it poses a lower COVID-19 risk than some other detention centers.

Thus, for all of the above reasons, the fact that Amine Khalifi would be placed into ICE detention for some period of time after release is *not* a reason for denial.

**Morocco**

Nor is the fact that there are many COVID-19 cases in Morocco a reason for denial. In Morocco, Mr. Khalifi will be living in a private home, where he will be able to take advantage of all the social distancing measures which are denied to him in prison.

**BOP Measures and FMC Butner**

Around the time this motion was filed, there were 10 inmates and 4 staff at FMC Butner who were infected with the virus. *When the response was filed, that number had risen dramatically to 123 inmate cases, showing that this facility is in the middle of a large COVID-19 outbreak.* Currently, according to bop.gov/coronavirus/, as of November 17, there are 97 inmates positive, as well as

6

7 staff positive for the virus. 61 inmates and 24 staff are said to have recovered, meaning that there have thus far been a total of 158 inmates and 31 staff who have contracted the virus at FMC Butner, 10 more inmates than the 148 reported in the Response as of November 13. Of the total inmate population (814) 158 have had the virus, which means that *19.4 %* of the population of FMC Butner has contracted COVID-19. The BOP testing data reveals that, as of November 17, there have been 627 tests with 166 positive results, a positivity rate of *26.5 %.*

While it may be true, as the government claims, that the majority of these cases are in the low security dorm, *there have been at least three cases on the Oncology Unit*. Moreover, it is submitted that this Unit shares staff with the other areas of the prison, and several staff have been infected, meaning that it is not unlikely that staff could infect inmates in the Oncology Unit. Given the lack of testing of staff and inmates in the dorm (unless they are symptomatic) there is no assurance whatsoever that Amine Khalifi is protected from COVID-19 in the Oncology Unit.

The recent large COVID-19 outbreak at FMC Butner is part of the overall trend nationwide, and especially behind bars. When this motion was filed, 16,884 inmates had tested positive for the virus. Only 3 weeks later, as of November 17, that number has increased to 21,208. The graph below shows the increase visually. When the motion was filed, 128 inmates had died. Now, 141 inmates have died,

7

which means that 13 more inmates have died of COVID-19 in the past three weeks.



A July 8, 2020 Research Letter has documented that the infection rates for COVID-19 are 5-6 times higher in prison than in the general population in the United States. See https://jamanetwork.com/journals/jama/fullarticle/2768249 The age-adjusted death rate from COVID-19 is three times higher in prisons than in the general population. https://jamanetwork.com/journals/jama/fullarticle/2768249. And a November, 2020 Washington Post article notes that the high rates of COVID-19 in prisons and jails poses a general public health risk. See

https://www.washingtonpost.com/national/coronavirus-outbreaks-prisons/2020/11/11/b8c3a90c-d8d6-11ea-930e-d88518c57dcc_story.html

**3553(a) Factors**

The initial Memorandum herein noted that compassionate release had been granted in at least five terrorism cases (*United States v. Hassan*, 2020 U.S. Dist. LEXIS 165638 [D. Minn. Sept. 10, 2020]; *United States v. Hassoun* 2020 U.S. Dist. LEXIS 129945 [NDIL July 3, 2020]; *United States v. El-Hanafi*, 2020 WL 2538384 [SDNY May 19, 2020]; *United States v. Tajideen*, 1:17-cr-046 [DDC May, 2020]; and *United States v. Hossain*, 2020 WL 3265001 [NDNY June 8, 2020.])

As discussed above, compassionate release was recently granted in another terrorism case – *United States v. Hasanoff*, 2020 U.S. Dist. LEXIS 199816 (SDNY October 27, 2020) (the defendant was convicted of material support to Al Qaeda and had served about half of his sentence.)

As with the above cases, this Court should find that based on all the facts and circumstances described herein and in the initial motion, the 3553(a) factors support release.

**Recidivism Rates for Terrorism Cases**

Because of the serious nature of the charges in terrorism-related cases, it is often believed that there is a high risk to the public when these defendants are

released. However, undersigned counsel has compiled a list of the 44 cases where the defendants were convicted of terrorism offenses (and placed on the DOJ list of terrorism convictions); served at least a ten-year sentence; and then were released[2], either to live in the United States, or to be deported to another country. (The list does not even include the cases where compassionate release was granted this year, as not a lot of time has passed since their release. However, it is extremely likely that they will also continue to live productive, law-abiding lives.)

There are many more cases where defendants were convicted of terrorism-related offenses, were sentenced to *less than 10 years*, and have since been released. It appears that none of them have engaged in any subsequent major crime (or any terrorism) either, but they were not included on this list, both because there were so many of them, and because it seemed to makes sense for comparison purposes to look at those who had served a fairly lengthy sentence, showing that the sentencing court believed the offense to be serious.

It appears that *not a single one of the 44 people has been implicated in any terrorism-related activity, or any other major crime[3]*. (It is submitted that if that were the case, it would likely have come up in a google search using the defendant's name and conviction, and/or been widely reported.) Moreover, counsel

---

[2] For the purposes of this list, counsel looked for those who had been released after January 1, 2004, as that time period tended to correspond with the cases on the DOJ terrorism list (listing convictions since 2001), although it also included a handful of cases that predated 2001.

[3] Counsel is not even aware of any of them having been charged or convicted or any minor offenses, although that is more difficult to know.

is aware of the circumstances of many of these defendants, both in the United States and abroad, and they are generally doing very well, and do not appear to pose any risk of recidivism. Thus it is submitted that the recidivism rates of those convicted of terrorism-related offenses is far lower (to non-existent) in comparison to other offenses.

The list is attached as Exhibit "A" and it includes many cases similar to the instant case – many of the defendants (often in sting operations) had the intent to engage in some sort of attack, but they no longer have that intent, or hold those ideas. Many of the defendants are United States citizens and are living their lives productively in this country without any problems. Others have been deported to other countries where they are likewise living their lives peaceably.

Finally, with regard to deportation, many courts have held that the fact that the defendant is to be deported means that there is *less* danger to the public. *United States v. Frometa*, supra, at 12; *United States v. Camacho-Duque*, supra, at 19; *United States v.* Yrorita, supra, at 13; *United States v. Guzman-Soto,* supra, at 10.

Therefore, for the reasons stated here and in the initial Memorandum, this Court should find that the 3553(a) factors support release herein.

## CONCLUSION

For the foregoing reasons, because of the risk posed to Amine Khalifi by COVID-19, and the danger posed by the large outbreak at FMC Butner, as well as all the other facts and circumstances herein, the Court should grant this motion.

Dated: November 19, 2020

Respectfully submitted,

_____/s/_____
*Kathy Manley*
KATHY MANLEY
*Pro Hace Vice*
26 Dinmore Road
Selkirk, NY 12158
(518) 635-4005 (phone and fax)
Mkathy1296@gmail.com

_____/s/_____
Ashraf W. Nubani VA #43595
AWN Point Law
5025-B Backlick Road
Annandale, VA 22003
Tel: (703) 658-5151
awn@awnpointlaw.com
*Local Counsel*

12

13